

# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### JACKSONVILLE DIVISION

2018 MAY -7 PM 1: 35

CLERK US DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DISTRICT

**TANDRA G. TEMPLE,**
*Petitioner,*

v.

**CITY OF JACKSONVILLE BEACH,**
**KELSEY EBERLE,**
    **An Individual and Officer of**
    **Jacksonville Beach Animal Control,**
**TAMMY MCGEE,**
**PET DOCTORS OF AMERICA, LLC**
*Respondents.*

**CASE NO.**
**3:18-cv-557-J-39OBT**

---

## PETITIONER'S FIRST AMENDED COMPLAINT

COMES NOW, Tandra G. Temple, Petitioner in the above-styled case, amends her complaint and shows this Court the following:

### INTRODUCTION AND SUMMARY

This cause of action arises from the negligent and deceitful acts of Kelsey Eberle (hereinafter "Eberle"), in her individual capacity and official capacity as a City of Jacksonville Beach Animal Control Officer; Tammy McGee (hereinafter "McGee"), an individual and resident of Ponte Vedra, FL; and Petitioner's vet, Pet Doctors of America, LLC located in Jacksonville Beach, FL (hereinafter "Pet Doctors").

Petitioner and Petitioner's son, own a 2-year-old Newfoundland dog named Belfort. Petitioner paid two thousand five hundred dollars ($2500.00) for Belfort. Belfort is a great dog and well-trained. Petitioner and Petitioner's son are excellent custodians of Belfort. Petitioner and Petitioner's son have never been cruel to Belfortd as Defendant's Eberle and McGee stated throughout this ordeal.

From June 26, 2017 to February 28, 2018, Petitioner and Petitioner's son lived at 1300 Shetter Ave. Apt. 3102, Jacksonville Beach, FL, 32250. In September 2017, Petitioner met a kind woman, Renee Robertson, who was homeless. Petitioner did her due diligence and contacted The Mission House to make sure Renee had good character. She does.

Petitioner offered Ms. Robertson a place to live if she would do housework and walk Belfort. Renee took Belfort on long walks, took him to The Mission House to visit with other homeless people. Everyone in Jacksonville Beach got to know Belfort. Belfort is very attached to Ms. Robertson.

On or about January 2018, Ms. Robertson took Belfort to the beach. Ms. Robertson let Belfort off the leash to play in the water. An unidentified person called Jacksonville Beach Animal Control. Eberle was dispatched. Eberle ticketed Ms. Robertson for not restraining Belfort. Eberle also requested from Ms. Robertson, Petitioner's name and contact information, including Petitioner's cellphone number. Ms. Robertson gave Eberle Petitioner's phone number. When Ms. Robertson returned to Petitioner's apartment, she told Petitioner that Petitioner may get a call from Eberle for the incident on the beach. Eberle never contacted Petitioner about the incident.

When Petitioner could no longer afford her rent, she had to break her lease in late February. Petitioner had to move and store her belongings. Petitioner rented 2 storage units in Jacksonville Beach. Petitioner allowed Ms. Robertson to stay in one of the units so she would not be homeless.

Petitioner is temporarily staying with her sister in Atlanta, until she can find another place in Jacksonville, FL.

Petitioner's son moved in with his father, who leases a condo in Southside. The condominium complex does not allow dogs. However, neither Petitioner nor Petitioner's son, could afford to board Belfort, so Petitioner's son took Belfort with him to his dad's. On or about March 14, 2010, the association found out Belfort was staying in the condo. Petitioner's son had to find another place for Belfort.

Petitioner's son works at the Jacksonville Beach Starbucks. Prior to Belfort's eviction from the condo, Petitioner's son would take Belfort to stay with Ms. Robertson while he worked. He would pick-up Belfort at the end of his shift. When the condo association evicted Belfort, Petitioner's son asked Ms. Robertson to sit Belfort until he could figure out an alternative situation. Ms. Robertson said, of course she would take care of Belfort. Petitioner's son would go by the storage unit to make sure Belfort was ok and he would take food for Belfort.

Defendant, McGee, rents a storage unit at the same location as Petitioner's storage units. McGee met Ms. Robertson at the storage unit. She also met Belfort. McGee offered to keep Belfort if Ms. Robertson ever needed help with Belfort. Ms. Robertson said no on several occasions.

On or about March 14, Ms. Robertson broke her cellphone. Petitioner continued to call Ms. Robertson on her cellphone because she didn't know Ms. Robertson had broken her phone.

Petitioner's son went to the storage unit on March 17, to see Belfort, but Ms. Robertson was not at the storage unit. Petitioner's son also tried to contact Ms. Robertson by phone.

On March 18, McGee told Ms. Robertson she would buy Ms. Robertson a cellphone, plus she would find housing for Ms. Robertson. Under false pretenses, McGee told Ms.

Robertson she would keep Belfort for a few days so Ms. Robertson could buy her new cellphone and meet with an agency that provides housing. *Unbeknownst to Petitioner,* McGee took Belfort. McGee did not contact Petitioner to tell her she had Belfort. McGee did not tell Petitioner she had taken Belfort. Also, McGee gave Ms. Robertson a business card with an incorrect home address.

On Monday, March 19, 2018, McGee arranged an appointment for Ms. Robertson to meet with the agency for housing. McGee also arranged an appointment for Ms. Robertson to get her new cellphone on Wed. March 21, 2018.

Petitioner's son returned to the storage unit on the March 19th but Ms. Robertson was not at the storage unit. Petitioner's son began to panic because he could not find Ms. Robertson, nor Belfort.

Petitioner continued calling Ms. Robertson but still could not reach her. Petitioner called The Mission House to find Ms. Robertson, she was not there. Petitioner called a friend of Ms. Robertson's but he had not seen her.

On March 20, 2018, McGee took Belfort to Pet Doctors, which is also Petitioner's vet. McGee told Pet Doctors that Belfort was being rehomed in Massachusetts. Pet Doctors gave McGee all of Belfort's records. Pet Doctors did not contact Petitioner and tell her McGee had her dog, nor did McGee contact Petitioner that she had taken Belfort to the vet. Pet Doctors, nor McGee, returned Belfort to Petitioner. Pet Doctors and McGee conspired to defraud Petitioner of her property.

On Wednesday morning, March 21, when Petitioner and Petitioner's son had not heard from Ms. Robertson, Petitioner left Atlanta for Jacksonville Beach to find Ms. Robertson and Belfort.

On the way to Jacksonville Beach, Petitioner called the Jacksonville Beach Animal Control at 10:32 a.m., to see if they had Belfort. No one answered and Petitioner left a message.

At 11:15, Eberle returned Petitioner's call. Eberle was very hostile toward Petitioner. Eberle started accusing Petitioner of animal cruelty; that Petitioner had given Belfort to a "homeless person"; she also stated that Florida is too hot for a black dog. Finally, Eberle told Petitioner that Belfort had a new home with McGee and that Eberle was taking good care of Belfort. Petitioner requested McGee's phone number and with hesitation, Eberle gave Petitioner McGee's phone number. For the record it's spring in Florida and not hot, plus neither Petitioner, nor Petitioner's son "gave" Belfort to a "homeless person." Also, Eberle had Petitioner's phone number from the previous incident on the beach with Ms. Robertson, yet Eberle never contacted Petitioner regarding the whereabouts of Belfort. Eberle did not insure that Belfort was returned to Petitioner. Eberle did not impound, nor open an investigation against Petitioner for Eberle's accusations of cruelty to animals. Eberle conspired with McGee to defraud Petitioner of her property.

Petitioner immediately called McGee, who began the same accusations as Eberle. McGee stated Petitioner had given Belfort to a "homeless person"; that it was too hot for a black dog in Florida; that Petitioner was guilty of animal cruelty. She also falsely stated that she had a new home for Belfort with a family in New Hampshire.

Petitioner became so distressed and for fear of having an accident, Petitioner took the closest exit, so she could talk to McGee. Petitioner told McGee that McGee was upsetting Petitioner and asked McGee to calm down. McGee continued to rant and rave at Petitioner telling Petitioner she had mistreated Belfort and did not have Belfort's best interest in mind. Finally, after Petitioner's constant pleading, McGee agreed to give Petitioner her dog and to meet at the Jacksonville Beach Target for the exchange. Petitioner agreed to text McGee when she was 15 minutes from Target.

McGee stated that she had taken Belfort to her vet. Petitioner interrupted and stated she has a vet in Jacksonville Beach, Pet Doctors of America (hereinafter "Pet Doctors"). McGee told Petitioner she knew that, because McGee took Belfort to Pet Doctors on Tuesday, March 20, for a check-up. McGee then began chastising Petitioner that she had failed to get Belfort's second shot for heartworms. McGee pleaded with Petitioner to give up Belfort, even to the point of begging Petitioner to think about it while driving to Jacksonville.

McGee also stated in a text, "You called and argued with them [about a vet bill] last time the dog was in." This is a false statement.

Petitioner called her son to let him know she had found Belfort and she was meeting McGee at Target to pick up Belfort.

Immediately, McGee began texting Petitioner, badgering her to let McGee give Belfort to the family she knows; however, the fabulous family she knew was her own family. The next text at 11:43 states "Message me when you are 15 min out. Should you decide you would like to rehire [sic] to dog. We know of a fabulous family and he is happy. He's spent

a lot of time on the streets these past few months and Florida is hot." She included a video of Belfort playing in a pond with her dog.

McGee continued to text Petitioner stating, "Please keep my contact should he ever become too much."

To appease McGee, and for fear that McGee would not return Belfort, Petitioner sent a text "U r wonderful! Thank u from the bottom and top of my heart!"

McGee continued to hound Petitioner, who was in total anxiety mode. McGee stated "Seriously-if he needs a home we can take him. I have been told by so many that she has had him for awhile [sic] and he was dumped on her. Please be sure that your son is being honest." This is when Petitioner realized McGee and Eberle were building a case to take Petitioner's dog.

Petitioner tried to calm McGee down by texting "I understand your concern but I'm asking you not to judge. There are extenuating circumstances that are private. I look forward to meeting you and seeing Belfort."

McGee was relentless causing Petitioner's anxiety to escalate, but McGee would not stop. She stated in another text, "I do understand that there are extenuating circumstances but I beg you to please put the dog first I will buy your son a smaller dog more conducive to Florida climate if that's what he wants. This guy is not going to stand a chance in Florida heat it's not fair to him. I'm not passing any judgment on you or your son I just really really really want what is best for Belfort. I am so worried about what is going to happen to him next it's made me sick." Then she sent a copy of the vet bill and stated in another text, "This is what you owe for the vet bill."

At 12:13 p.m. while Petitioner was driving to Jacksonville, Ms. Robertson called Petitioner on her new cellphone. Petitioner asked Ms. Robertson why she had not called Petitioner about Belfort. Ms. Robertson stated she broke her phone and just got a new one. She proceeded to tell Petitioner how nice McGee had been to her. That McGee had bought her the phone and found her a place to live. Petitioner told Ms. Robertson she should have called Petitioner or Petitioner's son to tell her about Belfort. Ms. Robertson apologized profusely. McGee told Ms. Robertson she would take Belfort for a couple of days until Ms. Robertson could sort out getting a new phone and apply for housing. Ms. Robertson stated she had McGee's business card. Ms. Robertson sent a text to Petitioner with McGee's information.

At 12:53, when Petitioner's son was on break at Starbucks, he called Petitioner to get the details about Belfort and what had happened. Petitioner explained the situation and told him she was concerned that McGee and Eberle were trying to take Belfort. Petitioner gave her son Ms. Robertson's new number so he could call her to find out more details. He also wanted McGee's number and Petitioner told him it was best for Petitioner to handle the situation. Petitioner advised her son to go to Pet Doctors and get Belfort's medical bills, which he did. He had Pet Doctors email the records to Petitioner.

Petitioner's son, being independent young man that he is, called Ms. Robertson and got McGee's phone number. He called McGee and told her he wanted to pick up his dog. McGee continued her abusive behavior chastising Petitioner's son for giving Belfort to a "homeless person"; that the dog is black and should not be in Florida; that Petitioner's son was mistreating his dog. Petitioner's son told McGee that if she did not return the dog, his mother would sue him. ***McGee refused to return Belfort to Petitioner's son.***

McGee apparently called Eberle after her conversation with Petitioner's son, Eberle then called Petitioner's son. Eberle began berating Petitioner's son stating he had mistreated Belfort; he "gave" Belfort to a "homeless person"; that the dog shouldn't live in Florida because it is too hot; and that she wanted to meet with him to ask him questions.

Petitioner's son called Petitioner to let her know Eberle would be calling Petitioner. Eberle called Petitioner while she was on the phone with her son. Petitioner took the call. Eberle began the same theme of accusations; that the dog was being mistreated; that it was too hot to have a black dog in Florida; that she wanted to meet with Petitioner's to discuss why he had given Belfort to a "homeless person." At that moment Petitioner became ***extremely concerned*** that Eberle was building a case to impound the dog and force Petitioner to give the dog to McGee.

Petitioner began questioning Eberle about her jurisdiction and why she needed to talk to Petitioner's son. Petitioner asked Eberle if she planned on taking the dog. Eberle stated she "would not guarantee" anything and that Petitioner had two choices A) Eberle would open an investigation for cruelty to animals and impound the dog or B) meet McGee and Eberle with Petitioner's son at the police station so Eberle could ask Petitioner's son questions. Petitioner chose B.

McGee continued to text Petitioner. Petitioner responded "I have tried to be nice and appreciative. I believe you are trying to set me up with animal control to take our dog. Don't go there." McGee responded, "What time do you want to meet At the police station with animal control present Do you have a rough estimate."

Petitioner built in an extra hour and text that her ETA was 5:10 p.m. When Petitioner arrived in Jacksonville Beach, she drove to McGee's purported address at 90 N. Roscoe Blvd., Ponte Vedra, FL. Petitioner flagged down a Ponte Vedra Sheriff and asked him to accompany her to McGee's address. She explained that McGee had her dog and that she was concerned that McGee was trying to take her dog. The officer was very helpful. He accompanied her to the address. He asked Petitioner to stay in her vehicle and he would go to the door.

A young man answered and the officer questioned him about the dog. He told the officer that he was renting the house and that he did not have Petitioner's dog. He also suggested the address may be 90 South Roscoe Blvd. The officer told Petitioner he was afraid Petitioner had been duped.

The officer and Petitioner tried to find 90 South Roscoe but the address did not exist. Petitioner thanked the officer for his assistance and proceeded to the Jacksonville Beach Police Station.

While driving to the station, Eberle called Petitioner again. Eberle told Petitioner that if she did not get there by 5:15, Petitioner could not get her dog. Petitioner assured Eberle that she would, indeed, be at the station by 5:15. Eberle told Petitioner that when she arrived at the station to ask a police officer to dispatch Eberle to the station.

On the way to the station, Petitioner saw two homeless men with a dog. Petitioner took several photos of the two men with their dog.

When Petitioner arrived, she did as she was told and asked the police officer to dispatch Eberle. Eberle showed up with a police officer in tow, as if Petitioner was a menace to

society, without Belfort. Eberle began verbally assaulting Petitioner with the same accusations that Petitioner was mistreating her dog. Petitioner offered the 40 pages of vet medical records to Eberle. Petitioner asked does this look like Belfort has been mistreated. Eberle refused to review the records.

When Eberle asked why Petitioner's son gave the dog to a "homeless person", Petitioner stated that while she was driving to the station she saw two homeless men with a dog and offered the photo to Eberle. Petitioner stated to Eberle, "I didn't know it was illegal for homeless people to have dogs." To which Eberle stated, well it's not but Florida is hot and black dogs shouldn't live in Florida. Petitioner then stated, "I didn't know it was illegal to have a black dog in Florida." Eberle stated, "Well it's not, but when we see a dog in the heat we have to make sure the dog is okay." Petitioner would like to reiterate it's Spring in Jacksonville and not the least bit hot.

Eberle then asked if Petitioner's son was coming to the station. Petitioner stated an emphatic "NO". Eberle told Petitioner to wait at the station and she would call McGee to bring the dog. McGee knew when Petitioner would arrive at the station, but she did not bring Belfort to the station until McGee called her. Petitioner avers Eberle wanted a chance to question Petitioner's son to open a fraudulent investigation, impound Belfort, and give him to McGee.

Eberle then asked the police officer, who was still standing there, if he was "ok", to intimidate Petitioner. Petitioner was *not* intimidated.

Fifteen minutes later, Eberle showed up with Belfort. Petitioner took her dog and put him in her car. Eberle then handed McGee's vet bill to Petitioner, stating that she knew it was

a civil matter, but McGee had done Petitioner a favor by taking care of Belfort and that I should pay the vet bill. Petitioner tried to hand the vet bill back to Eberle but she would not take it. Petitioner dropped it on the ground and walked toward her vehicle. Eberle snidely stated to Petitioner "Have a good day."

McGee still didn't give up hounding Petitioner. McGee sent more pleas for Petitioner to give her Belfort. "I'm sorry you're angry never my intent only to be sure Belfort was given back to the best situation." And, "My only concern is for Belfort and would be happy to take him if you ever get in to [sic] a situation and need to rehome him. We would be happy to pay a rehoming fee. He's a great dog and enjoyed being in the company of ours."


## BACKGROUND

Petitioner believes it is necessary to explain Petitioner and Petitioner's sons background to the Court. Petitioner believes the background explanation will help the Court to determine the severity of this cause of action.

Petitioner's son has severe depression, anxiety disorders and PTSD. Petitioner's son has been hospitalized twice for depression and thoughts of suicide. Petitioner's son has been exposed to a very abusive father.

Petitioner also suffers severe anxiety and PTSD.

Petitioner avers Defendant's negligence, conspiracy to commit fraud, interference with custody, defamation of character, and intentional emotional distress, misrepresentation,

breach of duty, wire fraud and harassment exacerbated Petitioner's and Petitioner's son's anxiety and PTSD.

## STATEMENT OF FACTS

1.   Petitioner is a resident of Florida.

2.   Petitioner is a paralegal.

3.   The City of Jacksonville Beach operates under a Council-Manager form of government and capable of suing and being sued. It is designed to operate like a corporation: The City Council acting as the Board of Directors and the City Manager as the Chief Operating Officer.

4.   The City Manager, George D. Forbes, as the Chief Operating Officer of the city, is charged with carrying out the policies made by Council and managing the day-to-day operations of the city. He prepares the annual budget for Council approval and hires City employees.

5.   Defendant City of Jacksonville Beach maintains and operates the City of Jacksonville Beach Animal Control which is responsible for the enforcement of the ordinances.

6.   Kelsey Eberle is employed by City of Jacksonville Beach as an Animal Control Officer.

7.   Pursuant to the Code of Ordinances City of Jacksonville Beach, FL, Chapter 5 Article I § 5-23(6), Eberle is an *"Animal Control Officer"* which means any individual employed by, contracted with, or appointed by the City Manager of Jacksonville Beach for the purpose of aiding in the enforcement of this article or any other law or ordinance relating to the licensure of animals, control of animals,

or seizure and impoundment of animals; and includes any local law enforcement officer or other employee whose duties in whole or in part include assignments that involve the seizure and impoundment of any animal.

8.  Pursuant to the Code of Ordinances City of Jacksonville Beach, FL, Chapter 5 Article I § 5-23(7), *"Owner"* means any person, firm, corporation, or organization possessing, harboring, keeping, or having control or custody of an animal or, if the animal is owned by a person under the age of eighteen (18), that person's parent or guardian.

9.  Tammy McGee is an individual and a Florida resident who lives in Ponte Vedra, FL.

10. Pet Doctors of America, LLC (hereinafter "Pet Doctors"), is Florida Limited Liability Company, filed with the Florida Department of State Division of Corporations, document number L11000074523.

11. Farzin Darabi is the registered agent for Pet Doctors of America, LLC.

12. Petitioner and Petitioner's son own a Newfoundland dog named Belfort.

13. Petitioner purchased Belfort in 2016 for two thousand five hundred dollars ($2,500.00).

14. Renee Robertson, who is not a party to this action, was homeless when Petitioner met her in Jacksonville Beach in September 2017.

15. Ms. Robertson lived with Petitioner for five (5) months until Petitioner had to break her lease.

16. When Petitioner had to move from her apartment in late February 2018, she rented two (2) storage units to store her belongings. Petitioner allows Ms. Robertson to live in Petitioner's storage unit in Jacksonville Beach, FL.

17. Ms. Robertson is a kind and loving person. She helped Petitioner with housework and took care of Belfort when Petitioner was at work. Ms. Robertson has bonded with Belfort and takes excellent care of him.

18. On or about March 15, 2018, McGee met Ms. Robertson while she was walking Belfort. McGee told Ms. Robertson she would take care of Belfort if she needed assistance. Ms. Robertson told McGee she did not need help with Belfort.

19. McGee has a storage unit in the same storage facility as Petitioner.

20. McGee took Ms. Robertson food.

21. On March 18, 2018, McGee offered to buy Ms. Robertson a new phone because Ms. Robertson had broken her cellphone.

22. McGee also told Ms. Robertson she would find Ms. Robertson a place to live.

23. Under false pretenses, McGee told Ms. Robertson she would take care of Belfort for a few days, while Ms. Robertson looked for a place to live. McGee took advantage of a Ms. Robertson's naivety. McGee coerced Ms. Robertson to allow McGee to take Belfort, by offering to buy Ms. Robertson a phone and finding a place for Ms. Robertson to live. McGee took Belfort under the auspices that so she would, "take care of him for a few days" while Ms. Robertson was busy getting her new phone and interviewing with agencies for Ms. Robertson's new place to live.

24. Unbeknownst to Petitioner, McGee took Belfort.

25. Because Ms. Robertson broke her phone, Petitioner could not reach her.

26. On March 19, 2018, Petitioner called The Mission House to find Ms. Robertson. Ms. Robertson was not there.

27. On March 20, 2018, Petitioner's son went to The Mission House to find Ms. Robertson but he could not find Ms. Robertson.

28. On the evening of March 20, 2018, Petitioner's son went to the storage unit to find Ms. Robertson. Ms. Robertson puts the lock on the storage unit so it appears the unit is locked. Petitioner's son did not know this and assumed Ms. Robertson was not there. Petitioner found out later that Ms. Robertson was in the storage unit.

29. On the morning of March 21, 2018, when neither Petitioner, nor Petitioner's son, could find Ms. Robertson, Petitioner decided to drive to Jacksonville Beach from Atlanta to find Ms. Robertson and Belfort.

30. While driving to Jacksonville Beach, Petitioner called Jacksonville Beach Animal Control to inquire if Belfort had been impounded. Petitioner left a message.

31. Eberle returned Petitioner's call.

32. Eberle proceeded to chastise Petitioner for leaving Belfort with a "homeless person."

33. Eberle also stated that Belfort is a black dog and should not live in Florida.

34. Eberle knows Petitioner's phone number, yet did not call Petitioner to inform her that McGee had Belfort.

35. Eberle told Petitioner that Petitioner was mistreating Belfort. If Belfort was being so mistreated why didn't Eberle impound Belfort and open an investigation for

cruelty to animals. Instead, she allowed McGee to keep Petitioner's dog without informing Petitioner of the whereabouts of her dog.

36. After several minutes of Eberle's abusive conduct, Eberle gave Petitioner McGee's phone number.

37. Eberle was hostile toward Petitioner and hung up on Petitioner.

38. When Petitioner called McGee, she thought McGee had taken the dog out of kindness, but had a very rude awaken when she spoke to McGee.

39. McGee, too, began chastising Petitioner regarding the care of Belfort.

40. McGee stated that a black long-haired dog should not live in Florida.

41. McGee stated she found a family in New Hampshire who would take the dog.

42. McGee was abrasive, dictatorial and rude to Petitioner. Petitioner was already in stress mode because Eberle had allowed McGee to take her dog.

43. At one-point McGee told Petitioner she had taken Belfort to the vet.

44. Petitioner told McGee that she has a vet, Pet Doctors of America in Jacksonville Beach.

45. McGee then stated, "I know. That is my vet and they know Belfort."

46. Petitioner has spent over one thousand seven hundred fifty dollars ($1750.00), at Pet Doctors to take care of Belfort.

47. Pet Doctors did not call Petitioner to inform her that McGee had Belfort.

48. McGee asked Petitioner to really think about what was in Belfort's best interest. McGee tried to convince Petitioner to give her the dog and misrepresented to Petitioner that she had found him a new home, when in actuality the new home was with McGee.

49. McGee told Petitioner to meet her at Target in Ponte Vedra to exchange the dog.

50. McGee began furiously texting Petitioner.

51. McGee's first text states the following "Should you decide you would like to rehire [sic] to dog. We know a fabulous family and he is happy. He's spent a lot of time on the streets these past few months and Florida's hot." Petitioner would like to point out that it is March.

52. McGee sent Petitioner a video of Belfort playing in a pond with McGee's dog.

53. McGee sent another text stating "Please keep my contact should he ever become too much".

54. Another text, "Seriously- if he needs a home we can take him. I have been told by so many that she has had him for awhile [sic] and he was dumped on her. Please be sure that your son is being honest".

55. Another text, "…I would beg you to please put the dog first I will buy your son a smaller dog more conducive to Florida climate if that's what he wants. This guy is not going to stand a chance in Florida heat its [sic] not fair to him. I'm not passing judgment on you or your son I just really really really want what is best for Belfort. I'm so worried about what is going to happen to him next it's making me sick".

56. Although Petitioner did not owe McGee any explanation, Petitioner was concerned McGee would not return Belfort to Petitioner. Petitioner called McGee to placate her.

57. McGee then told Petitioner to meet her at Jacksonville Beach Animal Control, instead of Target.

58. Ms. Robertson called Petitioner on Ms. Robertson's new phone purchased by McGee. Ms. Robertson told Petitioner, that McGee told Ms. Robertson to call her when she got the new phone. Petitioner told Ms. Robertson not to call McGee; that McGee was trying to take Belfort. That is when Ms. Robertson told Petitioner what had happened with McGee and McGee had Belfort. Ms. Robertson told Petitioner that McGee paid for her phone and got her a place to live.

59. McGee gave Ms. Robertson her business card with her phone number and an incorrect home address. Ms. Robertson text McGee's address to Petitioner, 90 N. Roscoe Blvd., Ponte Vedra, FL, 32082. McGee does not live at 90 N. Roscoe Blvd in Ponte Vedra.

60. When Ms. Robertson did not return McGee's call, McGee went to Petitioner's storage unit and tried to persuade Ms. Robertson to get Petitioner to give her Belfort. Ms. Robertson called Petitioner and relayed the conversation.

61. Petitioner gave her son, Ms. Robertson's new cell number. Petitioner's son called Ms. Robertson and got McGee's phone number.

62. Petitioner's son called McGee to ask her if he could go ahead and pick up Belfort from McGee. McGee started the same abusive tactics on Petitioner's son stating Belfort was being mistreated; he shouldn't live in Florida because he is black and it's hot; he gave Belfort to "homeless person"; and he was being cruel to Belfort. When McGee would not give Belfort to Petitioner's son, Petitioner's son became very anxious. Petitioner's son told McGee his mother would sue her if she did not give him his dog. *McGee refused to give Petitioner's son his dog.*

63. McGee then sent Petitioner another text message stating "Again when you are 15-20 min away please message me I will meet you at the Jax Beach police dept to exchange the dog. Please do not have your son call and threaten me again. I told you I would meet you there."

64. Petitioner responded to McGee with the following text about McGee's behavior toward Petitioner's son, "U have shown absolutely no respect for his, nor my boundaries. You have made this very difficult when it could have been a much easier process. I appreciate what you are doing for Renee. We have contacted a Jax Beach police officer that we know, regarding our rights as a dog owner...We don't want any trouble just our dog..."

65. McGee responded "We will meet you at the police station let me know when. I have said that many times. I need at least 15 min notice It's not difficult at all it's just safe for all parties involved".

66. Petitioner responded "I have tried to be nice and appreciative. I believe you are trying to set me up with animal control to take our dog. Don't go there."

67. McGee then responded, "What time do you want to meet At the police station with animal control present Do you have a rough time estimate".

68. Petitioner responded, "As discussed I will text you 15 mins away."

69. Petitioner sent an additional text "Just checked google maps. ETA 5:10 will text as I get closer."

70. Apparently, after McGee talked to Petitioner's son, McGee called Eberle to inform her of her conversation with Petitioner's son.

71. Eberle called Petitioner's son and began chastising him about leaving the dog with a "homeless person"; that he was mistreating his dog; that the dog should not live in Florida.

72. Petitioner's son called Petitioner to tell her Eberle had called him and that Eberle was trying to take Belfort from us. He also told Petitioner that Eberle would call Petitioner.

73. Eberle called Petitioner while she was on the phone with her son.

74. Petitioner took the call.

75. Eberle was ***extremely hostile to the point of harassment.***

76. When Petitioner began questioning Eberle about her jurisdiction, Eberle told Petitioner that if she didn't want to meet at the police station, she would open an investigation and impound Belfort; then Petitioner would have to pay animal control for impounding the dog, boarding fees and additional fees.

77. Eberle intimated that she was going to take Belfort on the grounds of cruelty; that he is a black dog and should not live in Florida; that I had given Belfort to a "homeless person."

78. Eberle then told Petitioner to make sure her son came with her so Eberle could question him about why he had given Belfort to a "homeless person."

79. Petitioner told Eberle that Petitioner's son did not have to answer any questions regarding Belfort.

80. Again, Eberle threatened Petitioner, that if Petitioner's son did not answer her questions she would open an investigation on Belfort and impound him.

81. When Petitioner questioned Eberle about possibly taking Belfort, Eberle stated she would not give any guarantee.

82. Eberle then told Petitioner she had two choices, A) if Petitioner did not meet her and McGee at the police station she would open an investigation and impound the dog or B) meet McGee and her at the police station so she could question Petitioner's son.

83. Petitioner chose B.

84. Petitioner called her son and told him to go to Pet Doctors and get Belfort's medical records. Petitioner's son had Pet Doctors email the records to Petitioner. A copy of Belfort's medical records from Pet Doctors of America are attached hereto as EXHIBIT "A" and incorporated herein by reference.

85. On page one (1) of the Patient History Report, under Communication Log on 3/20/2018 it states, **"Belfort, The p is being rehomed in Massachusetts. All records were given to Ms. Mcgee."** The records include Petitioner's name and phone number.

86. As planned, Petitioner arrived early in Jacksonville Beach.

87. Petitioner drove to the address McGee had given Ms. Robertson.

88. While on the way to 90 N. Roscoe Blvd., Petitioner flagged down a Ponte Vedra Sherriff and asked him to accompany her to the address. Petitioner told the officer that McGee had her dog and she was concerned McGee would not return Belfort.

89. When Petitioner and the officer arrived at 90 N. Roscoe Blvd, the officer went to the door.

90. The tenant answered the door and told the officer that he was renting the house; he had moved in the prior month; and that he did not know the McGee's. He suggested to try South Roscoe.

91. The officer stated to Petitioner that he was concerned Petitioner had been duped.

92. The officer had Petitioner follow him to see if 90 S. Roscoe Blvd. but the address did not exist. Petitioner thanked the officer for his help. He was very accommodating.

93. At 4:41 p.m., Eberle called Petitioner and warned her that if she was not there by 5:15 p.m., Petitioner would not get her dog. Petitioner assured her she would be there. Eberle told Petitioner to tell the police officer on duty to dispatch her and she would come to the station.

94. On the way to the Jacksonville Beach Police station, Petitioner took a photo of two homeless men with a dog. A copy of the photo is attached hereto as EXHIBIT "B" and incorporated herein by reference.

95. Petitioner arrived at the police station before 5:00 and asked the front desk to please dispatch Eberle.

96. Eberle met Petitioner at the police station without Belfort. Eberle was accompanied by a police officer as an effort to intimidate Petitioner. Petitioner was *not* intimidated.

97. Eberle proceeded to interrogate Petitioner.

98. Eberle stated that Petitioner had "given" Belfort to a "homeless person." Petitioner did not "give" Belfort to a "homeless person."

99.  Petitioner stated, she had just taken a photo of two homeless men with a dog. Petitioner stated she did not know it was illegal for a homeless person to have a dog and offered the photo to Eberle for review.

100. Eberle stated, it isn't illegal for homeless people to have dogs.

101. Eberle stated, that Belfort is black and should not live in Florida because of the heat.

102. Petitioner stated, she did not know it was illegal to have a black dog in Florida.

103. Eberle stated, it isn't illegal to have a black dog in Florida.

104. Eberle then asked if Petitioner's son was coming to the station.

105. Petitioner stated an emphatic "no."

106. Petitioner offered the 40 pages of medical records from Pet Doctors to prove Belfort was well cared for. Eberle refused to review the records.

107. Eberle then tried to tell Petitioner that McGee had taken good care of Belfort and that Belfort now had a good home.

108. Petitioner told Eberle to get her dog.

109. Eberle told Petitioner she would call McGee and have her bring Belfort to the police station and for Petitioner to wait at the station.

110. Eberle asked the police officer if he was "ok" and the officer said yes, as if Petitioner is a threat to society.

111. McGee knew what time she should be at the station, but she did not meet Petitioner at the station.

112. Finally, Eberle returned to the station with Belfort.

113. Petitioner immediately put Belfort in her car.

114. Eberle then handed McGee's vet bill to Petitioner and proceeded to tell Petitioner that McGee had taken such good care of Belfort and Petitioner should reimburse McGee.

115. Petitioner tried to hand the bill back to Eberle but she would not take it. Petitioner dropped it on the ground.

116. Eberle sarcastically told Petitioner to "Have a good day."

117. McGee continued to text Petitioner stating, "You're welcome for somebody caring about your pet making sure he had heartworm medication and decent pet food.".

118. Petitioner responded "You wreaked havoc on my life today... you caused so much stress not only to me but my son. You have NO idea what my son has been through. You are unbelievably disrespectful yet pretend to be caring. It's all about control for You. Ask Renee about me and my heart!"

119. McGee stated "You never intended to pay the vet bill. You called and argued with them last time the dog was in. Karma always comes back. Again have a safe trip home."

120. Petitioner never argued with Pet Doctors about a bill.

121. On March 22, 2018, Petitioner contacted Pet Doctors by email and requested Pet Doctor's email all invoice for veterinary bills she had paid.

122. Pet Doctors emailed the invoices to Petitioner. Petitioner calculated the bills. Petitioner paid Pet Doctors in excess of $1750. Is this maltreatment? Is this cruelty? Copies of the invoices are attached hereto as EXHIBIT "C" and incorporated herein by reference.

123. Petitioner responded to Pet Doctors stating "I am shocked that no one called me when a stranger brought my dog in. Plus, whoever assisted the woman made VERY derogatory false statements about me. It is, and was, your fiduciary duty to call me. I spent $1756 at your clinic. What are you going to do about this?" A copy of the email is attached hereto as EXHIBIT "D" and incorporated herein by reference.

124. Pet Doctors has not responded.

125. On March 22, 2018, Petitioner received yet another text from McGee that states the following, "My only concern is for Belfort and would be happy to take him if you ever get in to [sic] a situation and need to rehome him. We would be happy to pay a rehoming fee. He's a great dog and enjoyed being in the company of ours."

126. Petitioner avers McGee misrepresented to Ms. Robertson that she intended to return Belfort.

127. Petitioner avers McGee purposely gave Ms. Robertson the wrong home address.

128. Petitioner avers McGee and Eberle conspired to steal Petitioner's dog.

129. Petitioner avers McGee and Pet Doctors conspired to allow McGee to keep Belfort.

130. Petitioner avers Pet Doctors had a duty to advise Petitioner that McGee had Belfort.

131. Petitioner avers Pet Doctors breached their duty to maintain Belfort's records as private.

132. Petitioner avers McGee and Eberle harassed Petitioner.

133. Petitioner avers McGee and Eberle intentionally inflicted emotional distress on Petitioner and Petitioner's son.

134. Petitioner avers Eberle had a duty to contact Petitioner and return Belfort to Petitioner.

135. Petitioner avers McGee had a duty to contact Petitioner and return Belfort to Petitioner.

136. Petitioner avers Pet Doctors slandered Petitioner.

137. Petitioner avers McGee and Eberle conspired to commit fraud.

138. Petitioner avers McGee and Eberle interfered with Petitioner's custody of her dog.

139. Petitioner has incurred unnecessary expenses such as hotel rooms, gas, food expenses and boarding fees.

140. Petitioner avers The City of Jacksonville had a duty to return Belfort to Petitioner.

141. Petitioner avers Eberle, as an employee of The City of Jacksonville, had a duty to return Belfort to Petitioner.

142. Petitioner avers Eberle, as a reasonable person, had a duty to return Belfort to Petitioner.

143. Petitioner avers McGee as a reasonable person had a duty to return Belfort to Petitioner.

144. Petitioner avers Pet Doctors had a duty to keep Belfort and contact Petitioner.

145. Petitioner avers Pet Doctors had a duty to contact Petitioner about her dog.

## COUNT I
## 42. U.S.C. § 1983

146. Petitioner by reference and re-alleges each and every preceding paragraph of this Petitioner's First Amended Complaint as if restated completely herein.

147. Pursuant to 42 U.S.C. § 1983, "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress..."

148. Defendant Eberle resides in Duval County and is employed as an Animal Control Officer with the City of Jacksonville Beach, FL Animal Control. Defendant is sued as an individual and in her official capacity.

149. Petitioner alleges, Petitioner's right to her property was denied under the U.S. Const. amend. XIV § 1.

150. Petitioner alleges that the City of Jacksonville Beach had a duty to return Petitioner's dog to her.

151. Petitioner alleges that Eberle had a duty to return Petitioner's dog to her.

152. Defendant Eberle had a duty to contact Petitioner regarding the whereabouts of Belfort.

153. Defendant City of Jacksonville had a duty to contact Petitioner regarding the whereabouts of Belfort.

154. Defendants breached their duty.

155. Petitioner alleges, if Petitioner had committed animal cruelty, Eberle and The City of Jacksonville Beach had a duty to impound Petitioner's dog and open an

investigation for animal cruelty; however, Eberle, The City of Jacksonville Beach conspired with McGee to steal Petitioner's dog.

156. As a direct and proximate result of Defendants breach of duty, Petitioner believed her dog was missing.

157. As a direct and proximate result of breach of duty, Petitioner had to drive to Jacksonville Beach, FL from Atlanta to find her dog.

**COUNT II**
**INTERFERENCE WITH CUSTODY**

158. Petitioner by reference and re-alleges each and every preceding paragraph of this Petitioner's First Amended Complaint as if restated completely herein.

159. Had Petitioner not contacted Jacksonville Beach Animal Control, McGee and Eberle would not have returned Belfort to Petitioner.

160. McGee intended to keep Belfort.

161. Eberle intended to allow McGee to keep Belfort.

162. Eberle assisted McGee to take Belfort from Petitioner.

163. Eberle and McGee interfered with custody of Belfort.

164. Pet Doctors interfered with custody of Belfort.

165. Petitioner's son lives in Jacksonville. Had Eberle called Petitioner, Petitioner's son would have picked up Belfort.

166. As a direct and proximate result of Defendants acts, Petitioner believed her dog was missing.

167. As a direct and proximate result of Defendants actions, Petitioner was forced to drive to Jacksonville from Atlanta to insure the return of Belfort to his rightful owner.

## COUNT III
## CONSPIRACY TO COMMIT FRAUD

168. Petitioner by reference and re-alleges each and every preceding paragraph of this Petitioner's First Amended Complaint as if restated completely herein.

169. Eberle, McGee and Pet Doctors conspired to keep Belfort from his rightful owner.

170. Neither Eberle, McGee nor Pet Doctors contacted Petitioner regarding the whereabouts of her dog.

171. Neither Eberle, McGee nor Pet Doctors intended to return Belfort to Petitioner.

172. Petitioner had to travel to Jacksonville from Atlanta to find her dog.

173. As s direct and proximate result of Defendant's acts, Petitioner believed her dog was missing.

174. As a direct and proximate result of Eberle and McGee's actions, Petitioner had to travel to Jacksonville from Atlanta to search for her dog.

## COUNT IV
## NEGLIGENCE

175. Petitioner by reference and re-alleges each and every preceding paragraph of this Petitioner's First Amended Complaint as if restated completely herein.

176. Eberle had an official duty to contact Petitioner regarding the whereabouts of her dog.

177. Eberle had an official duty to return Petitioner's dog to her.

178. McGee had a general duty of reasonable care to contact Petitioner regarding the whereabouts of her dog.

179. McGee had a duty to immediately return Petitioner's dog to her.

180. Pet Doctors had a professional duty of reasonable care to contact Petitioner when McGee took Belfort to Pet Doctors.

181. Defendants had no intentions to return Petitioner's dog to Petitioner.

182. As a direct and proximate result of Defendants' negligence, Petitioner believed her dog was missing.

183. As a direct and proximate result of Defendants' negligence, Petitioner was forced to travel to Jacksonville from Atlanta to find her dog.

## COUNT V
## DEFAMATION OF CHARACTER

184. Petitioner by reference and re-alleges each and every preceding paragraph of this Petitioner's First Amended Complaint as if restated completely herein.

185. Pet Doctors communicated to McGee that Petitioner had argued about a bill with Pet Doctors, exposing Petitioner to ridicule.

186. Pet Doctors communicated to McGee that Petitioner had argued with Pet Doctors about a vet bill which reflects negatively on Petitioner's character, morality and integrity.

187. Pet Doctors' statement is false.

188. Pet Doctors slandered Petitioner's reputation to McGee.

189. As a direct and proximate result of Pet Doctors communication to McGee, Petitioner's reputation has been damaged.

## COUNT VI
## INTENTIONAL EMOTIONAL DISTRESS

190. Petitioner by reference and re-alleges each and every preceding paragraph of this Petitioner's First Amended Complaint as if restated completely herein.

191. Eberle and McGee conspired to trump up charges against Petitioner regarding Petitioner's care and treatment of her dog.,

192. Petitioner had a severe panic attack when she spoke to McGee and as a result of McGee's text messages.

193. Petitioner had a severe panic attack when she spoke to Eberle and Eberle was threatening Petitioner that Eberle was going to impound Belfort and open an investigation for cruelty to animals and Petitioner's son gave Belfort to a "homeless person."

194. Eberle and McGee were abusive toward Petitioner's son.

195. As a direct and proximate result of Eberle and McGee's acts, Defendants intentionally caused Petitioner and Petitioner's son emotional distress.

## COUNT VII
## MISREPRESENTATION

196. Petitioner by reference and re-alleges each and every preceding paragraph of this Petitioner's First Amended Complaint as if restated completely herein.

197. McGee misrepresented her home address.

198. Petitioner went to McGee's home to get her dog, but McGee no longer lived at 90 N. Roscoe Blvd, Ponte Vedra, FL.

199. McGee and Eberle misrepresented Petitioner was cruel to her dog.

200. McGee and Eberle misrepresented Petitioner "gave" her dog to a "homeless person."

201. As a direct and proximate result of McGee's misrepresentation, Petitioner could not find her dog and feared McGee would not return Petitioner's dog to her.

## COUNT VIII
## BREACH OF DUTY

202. Petitioner by reference and re-alleges each and every preceding paragraph of this Petitioner's First Amended Complaint as if restated completely herein.

203. The City of Jacksonville had a duty to return Petitioner's dog to her.

204. Eberle had an official duty as an Animal Control Officer to return Petitioner's dog to her.

205. McGee had a reasonable person duty to return Petitioner's dog to her.

206. Pet Doctors had a professional duty to return Petitioner's dog to her.

207. Defendants had foreseeable risk of harm to Petitioner.

208. As a direct and proximate result of Defendants' breach of duty, Petitioner believed her dog was missing.

209. As a direct and proximate result of Defendants' Breach of Duty, Petitioner was forced to travel to Jacksonville from Atlanta to find her dog.

## COUNT VIII
## WIRE FRAUD

210. Petitioner by reference and re-alleges each and every preceding paragraph of this Petitioner's First Amended Complaint as if restated completely herein.

211. Eberle and McGee participated in a scheme to defraud Petitioner.

212. Eberle and McGee did so with the intent to defraud Petitioner.

213. Eberle and McGee used interstate wire communications.

214. McGee called and text messaged Petitioner multiple times with false information to obtain custody of Petitioner's dog.

215. Eberle contacted Petitioner via phone to fraudulently obtain possession of Petitioner's dog.

216. Petitioner was driving in Georgia during these communications.

## COUNT IX
## HARRASSMENT

217. Petitioner by reference and re-alleges each and every preceding paragraph of this Petitioner's First Amended Complaint as if restated completely herein.

218. Eberle used her powers as an Animal Control Officer to threaten Petitioner that she would impound the dog and open an investigation for cruelty to animals.

219. McGee called and text messaged Petitioner multiple times with false information and harassing statements.

220. Eberle and McGee's conduct was vexatious behavior intended to intimidate Petitioner and Petitioner's son.

221. As a direct and proximate result of Defendants' vexatious behavior, Petitioner and Petitioner's son had panic attacks and exacerbated their PTSD.

## JOINT AND SEVERAL LIABILITY

222. Petitioner by reference and re-alleges each and every preceding paragraph of this Petitioner's First Amended Complaint as if restated completely herein.

223. By virtue of their individual and collective acts and omissions, Defendants are jointly and severally liable to Petitioner as such acts and omissions have proximately caused Petitioner to suffer single indivisible injury for which each Defendant is responsible.

## PUNITIVE DAMAGES

224. Petitioner by reference and re-alleges each and every preceding paragraph of this Petitioner's First Amended Complaint as if restated completely herein.

225. The conduct of each Defendant, as set forth herein above, showed willful misconduct, malice, fraud, wantonness, oppression or that entire want of care which would raise the presumption of a conscious indifference to consequences. Accordingly, punitive damages should be imposed against each Defendant pursuant to § 768.73, Fla. Stat. (2018), 42 U.S.C. § 1983 and other applicable laws, to punish and deter each Defendant from repeating or continuing such unlawful conduct.

## PRAYERS

WHEREFORE, Petitioner prays that this Court:

    a) Enter a judgment against Defendants;

    b) Order Defendants to reimburse Petitioner all costs incurred to travel to Jacksonville Beach which amount to on or about $750.00;

    c) Order Defendants to pay all costs associated with this action;

    d) Order Defendants to pay all costs to board Belfort;

    e) Order Defendants to pay compensatory damages;

    f) Order Defendants to pay general damages;

    g) In the interest of Justice, order an award of punitive damages to Petitioner;

    h) Order such other relief and further relief as the Court deems just and proper under the circumstances.

[SIGNATURE ON FOLLOWING PAGE]

Respectfully submitted this the 3rd of May 2018.

Tandra G. Temple, Pro Se
3948 3rd St. S #240
Jacksonville Beach, FL 32250
404-450-9052
tanditemple@gmail.com